## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **PAULA K. CRUMPLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No. 13-3022 |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION

**SUE E. MYERSCOUGH, U.S. District Judge:**

Plaintiff Paula K. Crumpler appeals the denial of her application for social security disability insurance benefits pursuant to 42 U.S.C. § 405(g). Crumpler has filed a Motion for Summary Judgment (d/e 14), and Defendant Carolyn W. Colvin, Commissioner of Social Security, has filed a Motion for Summary Affirmance (d/e 16). For the reasons set forth below, the decision of the Commissioner is AFFIRMED.

### I. STATEMENT OF FACTS

Crumpler was born on May 27, 1961. Application, R. 120. She is divorced with three adult children. Tr., R. 39.

Crumpler completed high school.  Tr., R. 41.  Her prior employment includes working as a service technician for a lawn service; an owner and operator of a bar and restaurant; a supervisor in a shipping and receiving department; and a traffic manager.  <u>See</u> Past Relevant Work History Summary, R. 200-202.

On October 13, 2009, Crumpler applied for disability insurance benefits alleging she became disabled on January 15, 2009.  Application, R. 120.  For purposes of her application, Crumpler was last insured on March 31, 2011, meaning she must establish her total disability on or before that date.  <u>See</u>, <u>e.g.</u>, <u>Bjornson v. Astrue</u>, 671 F.3d 640, 641 (7th Cir. 2012) (noting that "only if [plaintiff] was disabled from full-time work by [her last insured] date is she eligible for benefits").

Crumpler's application was denied initially and on reconsideration.  R. 64, 65.  Crumpler requested a hearing.  <u>See</u> R. 79.

On June 6, 2011, Crumpler appeared and testified before Administrative Law Judge (ALJ) Barbara Welsch.  Bob Hammond, the Vocational Expert, also testified.  On August 2, 2011, the ALJ

determined that Crumpler was not disabled.  ALJ Decision, R. 20-31.

Crumpler requested Appeals Council review.  On November 6, 2012, the Appeals Council declined review.  R. 11.  On January 4, 2013, Crumpler's request for an extension of time to file a civil action was granted.  R. 1.  Crumpler filed this cause of action on January 30, 2013.

## A.  Summary of the Medical Evidence

Crumpler first sought treatment for back pain on January 15, 2009, while living in Florida.  She complained to Dr. Salesia Alvarado that, a few weeks earlier, she experienced back pain and pain radiating down both legs.  R. 216.  That day, the back pain was not as bad, but Crumpler still had residual pain down her right leg.  R. 216.

An MRI performed on February 23, 2009 found disc desiccation at L4-L5 with broad based disc protrusion (herniation) impinging on the anterior spinal canal.  R. 271.  In addition, the MRI showed disc degeneration at L5-S1 with broad based disc protrusion (herniation) residing in the epidural fat.  R. 271.

In March 2009, Dr. Alvarado submitted an Attending Physical Statement to Lincoln National Life Insurance Company (Lincoln National) on behalf of Crumpler. R. 358 (dated March 2009). Dr. Alvarado stated that Crumpler was unable to work as of February 19, 2009 due to her "herniated disc lumber spine." R. 358. The objective findings included an MRI, X-ray and positive straight-leg-raise test. R. 358. Dr. Alvarado also stated Crumpler could not lift more than 10 pounds. Dr. Alvarado noted that Crumpler was house confined and had regressed. Dr. Alvarado did not know when Crumpler could return to work. R. 358.

On March 3, 2009, Dr. Alvarado referred Crumpler to Dr. Mark Oliver of the Ocala Neurosurgical Center. R. 210. On March 6, 2009, Dr. Oliver examined Crumpler and her MRI. Dr. Oliver believed Crumpler's pain could be related to the exacerbation of pre-existing osteoarthritis or muscular strain. R. 240. Dr. Oliver recommended physical therapy. R. 238, 240.

In March and April 2009, Crumpler participated in physical therapy. She was also issued a home transcutaneous electrical nerve stimulation (TENS) unit to help her perform functional duties throughout the house. R. 244. Physical therapy ceased after

Crumpler began experiencing problems with her neck.  See R. 251-52.  Although Crumpler returned to physical therapy on May 18, 2009, she was discharged on May 28 because she planned to return to Illinois to be closer to family in the event she had surgery on her back.  R. 255.

On July 2, 2009, Crumpler saw Dr. Jose A. Espinosa, Southern Illinois University Neurosurgery. R. 282.  An EMG (electromyography) nerve conduction study of the right upper and lower extremities revealed evidence of mild right carpal tunnel syndrome and "chronic mild right L5 radiculopathy (without evidence of any active ongoing denervation of the L5 innervated muscles at this time)."  R. 279.  Dr. Espinosa expressed his concern that "surgery does not seem that it is going to improve her current condition."  R. 281.

Dr. Espinosa referred Crumpler to Dr. Kristina Naseer for evaluation in the pain clinic and possible epidural steroids.  R. 281.  Crumpler saw Dr. Naseer and received transforaminal epidural injections on two occasions.  R. 290-91; 287.  Crumpler reported receiving no relief from the first injection.  R. 287.  The record does not specifically indicate the effect of the second injection.

On September 9, 2009, Crumpler met with Dr. Glennon Paul of Central Illinois Allergy & Respiratory Service, Ltd. Dr. Paul saw Crumpler as a child for her allergic rhinitis and extrinsic asthma but had not seen her in many years. R. 392. His physical examination of Crumpler was unremarkable. <u>See</u> R. 392 (noting no swelling of the extremities, no joint deformities, no focal weakness or gross sensory deficit). Dr. Paul referred Crumpler to Dr. Timothy VanFleet of the Orthopedic Center of Illinois for a lumbar disc evaluation. R. 393.

Dr. Paul also completed a Physical Restrictions & Limitations form for Lincoln National on Crumpler's behalf. Exhibit 21F, R. 365 (dated September 9, 2009). Dr. Paul noted that Crumpler could not stand, walk, sit, or drive for any hours in an 8-hour work day. R. 365. Crumpler could occasionally lift up to 10 pounds but could never lift over 10 pounds. R. 365. Crumpler could not use her hands for pushing or pulling or fine manipulation but could use her hands for simple gripping and up to two hours of keyboarding. R. 365. Crumpler could not use her feet for repetitive movement like foot controls. R. 365. Dr. Paul noted that Crumpler could never climb, crawl, bend, or reach above shoulder. R. 365. Dr. Paul

believed Crumpler could be exposed to weather 50% of the time but never exposed to extreme cold, extreme heat, wet or humid conditions, or atmospheric conditions. R. 365.

On September 18, 2009, Crumpler saw Dr. VanFleet. R. 314-15. In his physical examination, Dr. VanFleet noted that Crumpler had a difficult time ambulating across the floor secondary to an antalgic gait. See Dorland's Illustrated Medical Dictionary 97 (32nd Ed. 2012) (defining antalgic as "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain"). Crumpler had palpable discomfort across the right low back area. R. 314-15. Dr. VanFleet recommended strengthening exercises for Crumpler's neck and a lumbar discography for her back pain. R. 315.

Following the discography, Crumpler met with Dr. VanFleet, who advised Crumpler that she had a "negative discography at two levels, meaning they did not reproduce pain." R. 311. Dr. VanFleet explained that this meant there was a "high risk for not having improvement." R. 311.

Dr. Van Fleet suspected that the "pain generator is in the L5-S1 level that would need to be addressed if we did the fusion at the L4-5 level due to the actual degenerative nature would need to be

addressed as well." R. 311. Dr. Van Fleet advised Crumpler of the risks of the procedure, including the risk that the procedure will not improve her symptoms. R. 311.

On October 22, 2009, Crumpler underwent a transforaminal lumbar interbody fusion of L4-L5 and L5-S1. R. 300-302. Although the surgery initially seemed to relieve Crumpler's pain on the right side of her body, she began to experience pain in the left lower extremity. <u>See</u> R. 310, 385.

On November 6, 2010, Crumpler saw Dr. VanFleet and complained of pain into the lower extremity on the left side. R. 310. She did not really have any complaints of back pain or pain in the right lower extremity. R. 310. The radiographs demonstrated the implants were well-positioned and everything appeared to be in good position. R. 310. Dr. Van Fleet believed Crumpler had a "little bit of BMP radiculitis." R. 310; <u>see also</u> Stedman's Medical Dictionary 1622 (28th ed. 2006) (defining radiculitis as a synonym for radiculopathy, which is a disorder of the spinal nerve roots).

Crumpler saw Dr. Paul several times in November 2009 for wheezing, coughing, and shortness of breath. <u>See</u> R. 389 (exacerbation of COPD), 388 (exacerbation of asthma), 387

(asthmatic bronchitis), 386 (asthmatic bronchitis).  On November 23, 2009, Crumpler saw Dr. Paul and complained of low back pain that radiated back down into her buttock area.  R. 385.  Dr. Paul's physical examination of Crumpler was unremarkable regarding her musculoskeletal and neurologic condition.  <u>See</u> R. 385 (noting no joint deformities, no focal weakness, or gross sensory defect).

On November 25, 2009, Crumpler complained to Dr. Paul that her back pain was still bothering her.  R. 384. His physical examination of Crumpler was unremarkable regarding her musculoskeletal and neurologic condition.  <u>See</u> R. 384 (noting no joint deformities, focal weakness, or gross sensory defect).

By November 27, 2009, Crumpler referred to her back pain as severe when she saw Dr. Paul.  Again, Dr. Paul's physical examination of Crumpler was unremarkable regarding her musculoskeletal and neurologic condition.  <u>See</u> R. 383 (noting no joint deformities, focal weakness, or gross sensory defect).

On December 2 and December 7, Crumpler reported to Dr. Paul that she still had severe back pain.  R. 382, 381 (severe back pain radiating to the foot).  By this time, Crumpler was prescribed Lyrica (used for neuropathic pain); Flexeril (used to relieve skeletal

muscle spasms); Vicodin (used to relieve moderate to severe pain); and a Duragesic patch (used to relieve moderate to severe pain), among other medications. See R. 385 (prescribing Lyrica and Vicodin); R. 384 (prescribing Vicodin); R. 383 (prescribing Duragesic patch); see also www.medical-dictionary.thefreedictionary.com (last visited June 16, 2014).

On December 4, 2009, in between the two appointments with Dr. Paul, Crumpler saw Dr. VanFleet. Dr. VanFleet's notes reflect that Crumpler reported "a little bit of discomfort across her back still and some in the left leg." R. 337. Crumpler reported that the discomfort improved "mildly" and she "is feeling somewhat better at this point in time." R. 337. On December 4, 2009, Dr. Van Fleet noted Crumpler could "move across the floor reasonably well." R. 337. Dr. VanFleet noted Crumpler "will begin physical therapy for strengthening and stretching." R. 337.

On December 23, 2009, Crumpler began physical therapy with Premier Physical Therapy & Sports Rehabilitation (Premier). R. 343. The Back Evaluation performed by Premier noted Crumpler had a positive Faber, straight leg raise, and slump test. R. 344; see also Shiner v. Colvin, 2014 WL 1767126, at *7 n. 23 (May 2, 2014,

M.D. Penn.) (defining the Faber test as "a pain provocation test which reveals problems at the hip and sacroiliac regions" and a positive slump test as suggesting a herniated disc or nerve tension); www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview (last visited June 16, 2014) (the test is positive if the person experiences pain down the back of her leg below the knee when the affected leg is raised). Crumpler had tenderness on palpation to her left lumbar region. R. 345. The assessment portion of the Evaluation states that Crumpler suffers from low back pain and is severely limited in her lifestyle but is an excellent candidate for rehabilitation. R. 345.

Crumpler attended physical therapy on December 30, 31, 2009, January 5, 7, 12, 14, 18, and 19, 2010, and February 1 and 2, 2010. R. 340-341. Crumpler was reevaluated on January 7, 2010.

On the reevaluation form, Crumpler's score on the Oswestry Disability Index (based on a self-report questionnaire) was 78%, which put her in the "crippled" category. See, e.g., www.scientificspine.com/spine-scores/oswestry-disability-index.html (last visited June 16, 2014). The Evaluation also noted

that Crumpler continued to struggle with pain through the low back and has radicular symptoms to her lower left extremity.  R. 342.

On January 15, 2010, Crumpler saw Dr. VanFleet.  Crumpler told Dr. VanFleet that she was making progress and doing reasonably well.  She did have "some complaints of symptoms at this point."  R. 336.  Her biggest complaint was burning in her feet, toes, and legs.  R. 336.  Dr. VanFleet thought it sounded "neuropathic."  R. 336; see also Stedman's Medical Dictionary 1313 (defining "neuropathic" as relating to neuropathy, which is a disorder affecting any segment of the nervous system).

On physical examination, Dr. VanFleet found Crumpler had good range of motion.  R. 336.  He recommended Crumpler continue stretching and strengthening exercises.  R. 336.

On February 1, 2010, Crumpler saw Dr. Paul and reported she still had pain in the back radiating to the left foot.  R. 378.  Dr. Paul's physical examination indicated no joint deformities, focal weakness, or gross sensory deficient.  Dr. Paul prescribed fentanyl patches, 50 mg. every three days, Lyrica, and Norco (acetaminophen and hydrocodone for pain management), if needed.

R. 378. see also www.drugs.com/norco.html (last visited June 16, 2014).

On February 9, 2010, Crumpler was discharged from physical therapy to a home program. R. 339. The Discharge Summary notes that Crumpler did not meet her long term goals and progress was slower than expected. R. 339. Crumpler continued to have pain down her lower left extremity into the foot/ankle. However, the pain in the right lower extremity that she had before surgery was gone. R. 339. The Discharge Summary also notes that Crumpler was limited by an apparent nerve issue in the lower left extremity. R. 339.

On April 16, 2010, Crumpler saw Dr. VanFleet and complained of intermittent numbness and pain to the left leg. R. 350. Crumpler described an area of pain across the left plantar foot. In addition, Crumpler identified a new problem of numbness and tingling to the ulnar aspect of the hands. R. 350.

Dr. VanFleet noted a positive Tinel's sign at the elbow bilaterally and no weakness of the hands. See Stedman's Medical Dictionary 1772 (defining Tinel's sign as "a sensation of tingling . . . along the course of a nerve when the latter is percussed");

www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (noting that the Tinel's sign test is a common test used to diagnose carpal tunnel syndrome) (last visited June 16, 2014).  Dr. VanFleet recommended Crumpler work on a strengthening program for her back and wear elbow extension splits at night.  R. 350.

On April 22, 2010, Dr. Barry Mulshine of the Orthopedic Center of Illinois saw Crumpler at Dr. VanFleet's request regarding Crumpler's complaints of pain in her left foot.  R. 352.  Dr. Mulshine's physical examination indicated that Crumpler walked with an antalgic gait.  Crumpler had pain with light touch in the area of the first web space and the ball of the foot.  R, 352.  Tinel's testing across the deep peroneal nerve and posterior tibial nerve were both irritating and produced some radiating symptoms.  R. 352.  Crumpler had symmetric strength testing across the feet and all tendon groups crossing into the ankle, although she seemed to be tentative and showed some breakaway weakness.  R. 352.

Dr. Mulshine's assessment was that Crumpler had neurogenic type pain in the left foot. R. 353; see also Stedman's Medical Dictionary 1313 (defining neurogenic as "[o]riginating in, starting

from, or caused by, the nervous system or nerve impulses"). Dr.
Mulshine recommended Neurontin and Flector patches. R. 353; see
www.medicinenet.com/gabapentin-oral/article.htm (Neurontin, also
known as Gabapentin, may be used to treat nerve pain conditions)
(last visited June 16, 2014); www.rxlist.com/flector-patch-side-
effects-drug-center.htm (Flector patch used as a pain reliever) (last
visited June 16, 2014). If the pain persisted, Dr. Mulshine
suggested that consideration be given to an EMG. R. 353.

On May 14, 2010, Crumpler saw Dr. Paul and complained of
severe pain in the lumbosacral area and in the foot. Dr. Paul
recommended Crumpler continue the Norco. R. 376.

Also in May 2010, Dr. Paul completed an Attending
Physician's Statement for Lincoln National on behalf of Crumpler.
Exhibit 21F, R. 363. Dr. Paul wrote that Crumpler's diagnosis
included lumbar disc disease, nerve blockages, asthma, acid reflux,
and carpal tunnel. Dr. Paul did not mark whether Crumpler had
any physical limitations but marked the mental impairment as
"Class 4—Patient is unable to engage in stress situations or engage
in interpersonal relations." In the "Functional capacity (American

Heart Association)" portion of the form, Dr. Paul marked "Class 1 (no limitation)." R. 363.

Dr. Paul noted that Crumpler was house confined and he did not expect her condition to change in the future. R. 364. Dr. Paul did not mark any of the boxes relating to Activities of Daily Living with which Crumpler needed assistance. R. 364. Dr. Paul listed Crumpler's restrictions as including no lifting, standing, or repetitive movement. R. 364.

In July 2010, Dr. Paul's treatment note reflected that Crumpler was tender in the sacroiliac joints. R. 374. Dr. Paul gave Crumpler a steroid xylocaine injection in the sacroiliac joint on two sides. R. 374.

In August 2010, Dr. Paul completed another Attending Physician's Statement for Lincoln National on Crumpler's behalf. R. 354. Dr. Paul listed the diagnosis as including lumbar disc disease, chronic asthma, acid reflux, and an illegible diagnosis that may be "right vertebral." Exhibit 17F, R. 354. Dr. Paul classified Crumpler's physical impairments as "Class 4-Severe limitation of functional capacity; incapable of minimum (sedentary) activity (74-100%)." R. 354. Dr. Paul classified Crumpler's mental

impairments as "Class 2-patient is able to function in most stress situations and engage in most interpersonal relationships (slight limitations)." Dr. Paul marked "class 4 (Complete limitation)" with regard to Crumpler's functional capacity. R. 354. (Obviously in stark contrast to the prior Attending Physician Statement of May 2010 which noted "Class 1 (no limitation).")

Dr. Paul noted that Crumpler was house confined and that he did not expect her condition to change in the future. R. 355. Dr. Paul did not mark the Activities of Daily Living with which Crumpler needed assistance but did mark "no" to the question whether he expected the limitations to Crumpler's ability to perform activities of daily living to be permanent. R. 355.

In September 2010, Crumpler saw Dr. Paul for shoulder pain. R. 373. Dr. Paul advised Crumpler to continue gabapentin for severe back pain. R. 373. In October 2010, Crumpler told Dr. Paul she continued to have severe back pain (R. 371) and shoulder pain (R. 372). On October 22, 2010, Crumpler told Dr. Paul that the gabapentin made her "loopy" so he reduced the dosage. R. 372.

In October or September 2010 (the form contains two different dates) Dr. Paul completed a form titled "Back," based on Listing

1.04.  See Exhibit 18F, R. 356-57.  Dr. Paul checked boxes noting "yes" or "no" answers.  Dr. Paul indicated that Crumpler did not have sensory loss, that spinal arachnoiditis had not been confirmed by operative note or pathology report, and that spinal arachnoiditis was not manifested by severe burning or painful dysesthesia.  R. 356; see also www.webmd.com/pain-management/guide/pain-management-arachnoiditis (defining arachnoiditis as "a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surrounds and protects the nerves of the spinal cord") (last visited June 16, 2014).  Dr. Paul responded "yes" to all remaining questions, indicating that there was evidence of nerve root compression, limitation of motion of the spine, reflex loss, positive straight-leg raising, a need to change position more than once every two hours, and that Crumpler had spinal stenosis resulting in pseudoclaudication.  R. 357; see also www.medical-dictionary.thefreedictionary.com/psuedoclaudication (defining pseudoclaudication as painful cramps caused by spinal, neurologic or orthopedic disorders) (last visited June 16, 2014).  Dr. Paul also marked "yes" to questions indicating that spinal stenosis had been established by findings on appropriate medically acceptable

imaging, resulted in chronic nonradicular pain and weakness, and resulted in an inability to ambulate effectively. R. 356-57.

In February and March 2011, Crumpler complained to Dr. Paul of the same back pain. R. 370 (February 4, 2011 physical examination finding no joint deformities, focal weakness, or gross sensory deficit); R. 369 (March 31, 2011 physical examination finding no joint deformities, focal weakness, or gross sensory deficit). In April 2011, Crumpler complained to Dr. Paul of lumbar disc and foot pain. R. 377 (April 16, 2011 physical examining finding tenderness and pain on abduction of the shoulder but otherwise no joint deformities, focal weakness, or gross sensory deficit).

In May 2011, Dr. Paul's physical examination noted tenderness over the lumbosacral area. R. 368. In June 2011, Crumpler complained to Dr. Paul of pain down into the foot. Dr. Paul's physical examination noted falling arches but no other unusual findings. R. 375 (June 25, 2011 physical examination finding no joint deformities, focal weakness, or gross sensory deficit).

**B. Physical Residual Functional Capacity Assessment**

On November 30, 2009, Dr. Lenore Gonzalez, a state agency physician, prepared a Physical Residual Functional Capacity Assessment.  R. 327-334.  Dr. Gonzalez reviewed the medical records and concluded that Crumpler could occasionally lift and carry up to 20 pounds; frequently lift up to 10 pounds; stand and/or walk about 6 hours in a normal 8-hour workday; sit for 6 hours in a normal 8-hour workday; and push and/or pull an unlimited amount of time.  R. 328.  Dr. Gonzalez based these findings on the fact that, while Crumpler had a history of back problems, the problems were treated surgically on October 22, 2009.  Dr. Gonzalez noted that Crumpler currently complains of pain into the lower extremity on the left side but does not complain of any right lower extremity difficulty or any back pain.  Dr. Gonzalez also noted that radiographs demonstrate that the implants are well-positioned.  R. 328.

Dr. Gonzalez concluded that Crumpler could occasionally climb, balance, stoop, kneel, crouch, and crawl.  She also noted that frequent postural changes will only aggravate the impairment. R. 329.

Dr. Gonzalez found no manipulative, visual limitations, communicative, or environmental limitations had been established. R. 330-31. Dr. Gonzalez also found Crumpler's statements regarding her symptoms partially credible but that the extent of the limitations described by Crumpler exceeded that supported by the objective medical findings. R. 334.

In April 2010, Dr. Calixto Aquino, a state agency physician, affirmed the Evaluation, noting that all objective medical evidence of record affirms the prior residual functional capacity determination. R. 347-349.

## C.    Summary of the Evidence Presented at the Hearing

On July 19, 2011, the ALJ held an evidentiary hearing. Transcript, R. 38-63; <u>see also</u> 20 C.F.R. § 404.929 (providing that a claimant may request a hearing at which the claimant may submit new evidence, examine the evidence used in making the determination, and present and question witnesses). Crumpler appeared in person along with her attorney. Bob Hammond, the Vocational Expert, was also present. <u>See</u> 20 C.F.R. § 404.1560(b)(2) (noting that the agency may use the services of vocational experts). The hearing lasted approximately 38 minutes.

Crumpler testified she lives in a mobile home by herself, although her daughter had lived with her from approximately October 2010 to February 2011. R. 39, 46, 51. All three of Crumpler's children live nearby. R. 50.

Crumpler drove to the hearing that day in her truck. She drives her truck to pick up things at the store and go to her doctor. She estimated she drove once every couple of weeks. R. 47. However, she testified that the last time she drove other than the day of the hearing was a few days earlier when she went to the store. R. 48.

Crumpler was not currently working. She last worked for Middleton Lawn and Pest Control as a service technician. R. 41; see also Disability Report, R. 149 (based on information provided by Crumpler and indicating that Crumpler worked at Middleton from May 2007 to January 2009). After Crumpler injured her back in January 2009, she went on medical leave, then short-term disability. R. 41-42; see also Tr. 40 (Crumpler testifying that she was on long-term and short-term disability until April 2011).

Crumpler testified that she had a lot of back pain, foot pain, and pain going down her legs and her arms. R. 44. The pain

causes her to lose sleep.  R. 44.  She has also fallen a few times because her legs give out on her.  R. 44.  The medications "take the edge off" but she is still in pain.  The medications also make her a little dizzy, and she must lie down.  R. 45; <u>see</u> <u>also</u> R. 53 (testifying that the pain medications make her dizzy and sleepy).

Crumpler spends her day at home napping on and off because she does not sleep well at night.  R. 45.  She spends most of the day lying down.  R. 51

Crumpler does not do any housework.  Her son mows her lawn, and her niece and daughter vacuum, dust, and clean the bathrooms.  R. 45.  Crumpler has a dog, but her adult children take care of the dog for her.  R. 62.

Crumpler does not fix her own meals, but she can microwave things.  Crumpler cannot stand long enough to cook a meal.  R. 46. She makes coffee, but not a full pot because she has problems pouring it.  R. 45.

Crumpler goes grocery shopping but does not get the 'heavy stuff."  R. 46.  Crumpler's daughter "does the heavy stuff."  R. 46.

Family and friends visit Crumpler at the house.  R. 47. Crumpler goes outside and sits on the porch for a little bit when the

weather is nice.  R. 48.  She bathes herself, dresses herself, combs her hair, and brushes her teeth.  R. 48.  However, it takes her a long time to do those things.  R. 62.  She has to sit down at least five times during the hour and a half to two hours it takes her to get ready.  R. 62.

Crumpler smokes a half a pack to a pack of cigarettes a day. R. 48.   Her doctor has not talked to her about any connection between smoking and the back pain.  R. 48.

Crumpler uses the computer to check her email.  She does not play any games on the computer.  R. 49.

Crumpler was out of state two weeks prior to the hearing to see her boyfriend in North Carolina for one week. R. 49.  Crumpler's daughter drove her.  R. 49.  About six months earlier, Crumpler and her daughter drove to Lincoln, Illinois to the State park.  R. 50.

Before undergoing surgery on October 22, 2009, Crumpler had tried physical therapy and injections.  R. 51.

Crumpler testified that she can sit in a regular office chair for less than five minutes before she becomes extremely uncomfortable. R. 51.  At this point, Crumpler's attorney told Crumpler her that, if she needed to stand up, she could do so as long as she spoke into

the microphone.  It is unclear from the transcript whether Crumpler remained standing:

A.          Okay.  Yeah, can I stand up?

Q.          Yes.

ALJ:        That means you have to stoop—

CLMT:       Oh.

ALJ:        --talk into the mic.

CLMT:       Okay.  I'll just.

R. 51-52.

Crumpler further testified that she has problems standing and cannot stand on her left foot at all without it hurting.  R. 52. Crumpler did not have the left foot pain prior to her surgery.  R. 52. If she stands too long, her feet swell, her left foot gets hard, and the pain gets worse.  R. 52.  Crumpler did not believe that she could get through an 8-hour workday by alternating sitting with standing because she cannot sit very long or stand very long.  R. 53. Crumpler also testified that it is hard for her to walk any length. She has to stop and sit because her foot gets hard and almost feels like it is frostbitten all the time.  She said she has to keep a sock on

her foot and in the winter she has to wrap a heating pad and blanket around her foot to stop it from hurting so much.  R. 53.

Crumpler also stated she has pain in her lower back that goes down her legs and her arms into her fingers.  R. 53.  Her fingers tingle.  R. 53.  Crumpler has muscle spasms.  R. 54.  She uses a TENS unit and medication for the muscle spasms.  R. 54.  She has gotten nauseous and sick from the pain.  R. 54

Crumpler gets a total of about 3 hours of sleep a night.  She takes Lorazepam, but she can only sleep for an hour before she is awake again.  R. 54

Crumpler puts a pillow behind her back when she is driving.  R. 54.  She has difficulty being a passenger in the car because she has to move around a lot.  Her back gets hard and starts hurting.  R. 54

A good day for Crumpler is getting out of bed and being able to walk.  She has about three good days in a week.  R. 55.  Crumpler currently sees Dr. Paul but cannot see him as often as she did when she first started having back pain because she lost her insurance.  R. 55.

The ALJ also questioned Bob Hammond, the Vocational Expert.  R. 55.  The ALJ asked the Vocational Expert the following hypothetical:

> [A]ssume an individual who is between 47 and 50 years old, high school education, past relevant work as described, an individual who would be limited to light and sedentary work with the following exceptions: no jobs which would require climbing of ladders, ropes, scaffolds or work at unprotected heights, jobs that do not require more than occasional stooping, bending, twisting, no jobs that require working in a concentrated exposure to respiratory irritants, including temperature.  How would these restrictions affect the performance of past relevant work?

R. 55-56.  The Vocational Expert testified that such individual would be able to perform the requirements of Crumpler's past relevant work as a traffic manager, shipping and receiving supervisor, and bookkeeper.  R. 56.  However, if a limitation on prolonged walking were added, that would eliminate the shipping and receiving supervisor position.  R. 56.

The Vocational Expert noted a number of transferable skills Crumpler acquired that would transfer to several positions including cashier, production clerk, bill collector, and non-emergency dispatch (all sedentary positions).  The Vocational Expert also gave examples of unskilled entry-level jobs that fit the

hypothetical, including no prolonged walking.  R. 58.  These jobs included the following "light" positions: assembler II, order clerk; and parking lot attendant; and the following "sedentary" positions: information telephone clerk and charge account clerk/order clerk. R. 58-59.

On examination by counsel, the Vocational Expert testified that, in general, the jobs identified would provide a break at two hours and at six hours for approximately 10 minutes, a 30 minute break midway through the shift, one unscheduled break in the first half of the shift, and one unscheduled break in the second half for six minutes.  R. 59.  There would be more leeway on breaks for the clerical type positions and the manager positions.  R. 59-60.

The Vocational Expert further testified that if the hypothetical given added the need to take five or more unscheduled breaks of more than 15 minutes at a time during the day, all of the positions would be precluded.  R. 60.  If the same individual would have to miss three or more days a month due to pain and complications of the  medication, that would eliminate all of the positions at Specific

Vocational Preparation 4[1] and below.  However, Crumpler's past

relevant work positions of bookkeeping, shipping and receiving

supervisor, and the manager position, would allow three days a

month after a probationary period of 30 to 90 days.  R. 61.  The

Vocational Expert agreed, however, that missing four or more days

a month during the probationary period would not be allowed.  R.

61.

If the hypothetical claimant could stand for less than one hour

in an eight-hour workday, sit for less than one hour in an eight-

hour workday, and walk for less than one hour in an eight hour

work day, all of the positions would be precluded and there would

be no positions the hypothetical claimant could perform.  R. 61.

**D.     Summary of the ALJ's Decision**

On August 2, 2011, the ALJ issued her decision denying

Crumpler's application for disability insurance benefits.  The ALJ

followed the five-step analysis set forth in the Social Security

---

[1] See Dictionary of Occupational Titles, Appendix C ("Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation"); see also Social Security Ruling (SSR) 00-4p (unskilled work corresponds with an SVP of 1-2; semi-skilled correspondents to an SVP of 3-4; and skilled work correspondents to an SVP of 5-9).

Administration Regulations.  20 C.F.R. §§ 404.1520.  The ALJ

found that Crumpler had not engaged in substantial gainful activity

since her alleged onset date (step one); Crumpler had the severe

impairments of degenerative disc disease post-fusion surgery, EMG

findings of mild right L5 radiculopathy, mild chronic carpal/cubital

tunnel syndrome, migraine headaches, and asthma (step two); the

impairments did not singly or in combination meet or medically

equal any listed impairment (step three); Crumpler was able to

perform her past relevant work of traffic manager and bookkeeper

(step four); and, in the alternative, even if Crumpler could not

return to her past relevant work, there were a significant number of

other jobs in the economy that Crumpler could perform (step five).

Specifically, at step three, the ALJ found that Crumpler did

not have an impairment or combination of impairments that met or

medically equaled one of the listed impairments in 20 C.F.R. Part

404, Part P, Appendix 1.  In so finding, the ALJ did not give

controlling weight to the opinions Dr. Paul gave for the sole purpose

of supporting Crumpler's disability with her insurance company.  R.

23.  The ALJ gave more weight to Dr. Paul's actual findings in his

treatment notes.

Between steps three and four, the ALJ determined that Crumpler had the functional capacity to perform light[2] and sedentary[3] work. The ALJ found that, due to the medication side-effects, shortness of breath, and possible musculoskeletal pain exacerbation, Crumpler should not climb ladders, ropes, or scaffolds.  R. 24.  Due to back, leg, and foot pain, Crumpler should not perform more than occasional bending, stooping, or twisting.  R. 24.  Due to possible asthma exacerbation, Crumpler should not work in concentrated exposure to respiratory irritants including temperature extremes.  R. 24. Finally, due to possible leg/foot pain exacerbation, Crumpler should not engage in prolonged walking.  R. 24.

In determining Crumpler's residential functional capacity, the ALJ again did not give controlling weight to the opinions given by Dr. Paul in his submissions to the insurance company.  R. 28. With respect to Crumpler's subjective complaints, the ALJ found that Crumpler had medically determinable impairments that could

---

[2] This means lifting or carrying ten pounds frequently and 20 pounds occasionally, standing or walking, off and on, for a six-hour workday, intermittent sitting, and using arms and hands to grasp, hold, and turn objects.  See 20 C.F.R. § 404.1567(b); Social Security Ruling 83-10.
[3] This means lifting no more than 10 pounds at a time, standing or walking no more than 2 hours of an 8-hour workday, sitting six hours of an 8-hour workday, and for unskilled sedentary jobs, good use of hands and fingers for repetitive hand-finger actions.  See 20 C.F.R. § 404.1567(a); Social Security Ruling 83-10

reasonably be expected to cause some of the symptoms. R. 24. The ALJ also found, however, that Crumpler's statements "concerning the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 24. Ultimately, the ALJ found that the medical evidence, laboratory findings, and Crumpler's reported activities indicated that Crumpler's functioning was not as limiting as she alleged. R. 28.

At step four, and based on the residual functional capacity and the testimony of the Vocational Expert, the ALJ found that Crumpler could perform her past relevant sedentary work as a traffic manager or bookkeeper as those jobs are usually performed in the national economy. R. 29. Therefore, Crumpler was not disabled.

The ALJ also made the alternative finding at step five that, even if Crumpler could not perform her past relevant work, other jobs existed in the national economy that Crumpler is able to perform. In making this determination, the ALJ considered Crumpler's residual functional capacity, age, education, and past

work experience, and the Vocational Expert's testimony.  R. 29-30.

Therefore, the ALJ found Crumpler was not disabled.  R. 30.

Crumpler requested Appeals Council review.  On November 6, 2012, after considering additional evidence, the Appeals Council declined review.

## II. LEGAL STANDARD

To be eligible for benefits, a claimant must suffer from a disability, defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is considered disabled if her impairments are of such a severity that she is not only unable to perform her previous job but cannot, in light of her age, education, and work experience, engage in any other kind of substantial work existing in the national economy.  42 U.S.C. § 423(d)(2)(A).

When the Appeals Council denies review, the ALJ's decision becomes the final decision of the Commissioner.  Getch v. Astrue, 539 F.3d 473, 480 (7th Cir. 2008).  This Court reviews the ALJ's

decision to determine whether it is supported by substantial evidence.  See 42 U.S.C. § 405(g); Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007).  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate'" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971), quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938).  In conducting this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993) (finding that additional evidence submitted to the Appeals Council could not be used as a basis for finding reversible error where the Appeals Council denied the claimant's request for review based on that evidence).

This Court must accept the ALJ's findings if they are supported by substantial evidence and may not reweigh the evidence or substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The Court will not reverse the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008) ("It is only when the ALJ's determination lacks any explanation or support that we will declare

it to be "patently wrong" . . . and deserving of reversal") (citations and quotations omitted).  The ALJ must articulate at least minimally her analysis of all relevant evidence.  <u>Herron v. Shalala</u>, 19 F.3d 329, 333 (7th Cir. 1994).

## III. ANALYSIS

On appeal, Crumpler argues the ALJ failed to properly articulate her decision to deny benefits and, therefore, the ALJ's decision is not supported by substantial evidence.  Specifically, Crumpler argues: (1) the ALJ failed to evaluate the opinions of her treating physician, Dr. Paul, consistent with the regulations and (2) the ALJ's credibility determination was patently wrong.  Crumpler asserts that these errors undermine the ALJ's residual functional capacity finding and render the Vocational Expert's response to the hypothetical question insufficient as a matter of law to support the ALJ's denial of benefits.

## A. The ALJ Evaluated Dr. Paul's Opinions Consistent with the Regulations

Crumpler first argues that the ALJ failed to evaluate Dr. Paul's opinions consistent with the regulations.  Crumpler asserts that the ALJ failed to give appropriate weight to Dr. Paul's opinions despite

the fact that no examining source rendered an opinion contrary to Dr. Paul's opinion and the only contrary opinion was that of a non-examining state agency consultant whose opinion predated a significant portion of the record before the ALJ. Although unclear, this appears to be an argument that the ALJ should have afforded Dr. Paul's opinions controlling weight. Crumpler also argues that even though the ALJ found that Dr. Paul's opinion did not warrant controlling weight, the ALJ should have weighed the medical opinion based on the factors set for at 20 C.F.R. § 404.1527(d) (2011).

       1.   <u>The ALJ's Decision Not to Afford Dr. Paul's Opinions Controlling Weight is Supported by Substantial Evidence</u>

A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2) (2011); <u>Ketelboeter v. Astrue</u>, 550 F.3d 620, 625 (7th Cir. 2008) (recognizing that while a treating physician has been able to observe the claimant over a long period of time, the opinion may be unreliable if the physician is sympathetic with the claimant). The

ALJ must give good reasons for not giving the treating physician's opinion controlling weight.  <u>Schmidt v. Colvin</u>, 545 Fed. App'x 552, 557 (7th Cir. 2013) (unpublished disposition).  The ALJ may discount a treating physician's opinion where that opinion is internally inconsistent, inconsistent with the opinion of the consulting physician, or based solely on the subjective complaints of the patient.  <u>Ketelboeter</u>, 550 F.3d at 625.

In this case, the ALJ gave a number of reasons for refusing to give controlling weight to the opinions Dr. Paul expressed in the forms submitted to Lincoln Financial (Exhibits 17F, 18F, and 21F).  The ALJ found that Dr. Paul accepted every subjective symptom of Crumpler and his opinions were not supported with medical findings.  R. 23 (citing examples from the record).  The ALJ indicated she gave more weight to the objective medical findings in the treatment notes than the opinion evidence.  R. 23.

The ALJ also refused to give controlling weight to Dr. Paul's opinions because Dr. Paul provided little to no explanation for his finding of total disability or his conclusion that Crumpler's was unable to sustain even sedentary work.  R. 28.  The ALJ noted that Dr. Paul was not a specialist, and his opinions relating to the

inability to work were inconsistent with his own treatment notes as well as the objective record. R. 28 (citing examples from the record, including Dr. Paul's treatment notes reflecting unremarkable examinations and no evidence in the treatment notes of nerve root compression yet Dr. Paul marked on the insurance forms that Crumpler had nerve root compression). The ALJ believed Dr. Paul was a "sympathetic doctor attempting to help" his patient receive disability benefits. R. 23.

The reasons given by the ALJ for not giving controlling weight to Dr. Paul's opinions are adequate and supported by substantial evidence. See Ketelboeter, 550 F. 3d at 625 (substantial evidence supported the ALJ's decision to give greater weight to the state-agency opinions than the opinions of the claimant's treating physician where the record contained little objective evidence to support the severity of the claimant's self-reported symptoms and the physician's conclusions about the limitations were based almost entirely on the claimant's subjective complaints; the physician's opinions were also internally inconsistent); Schmidt v. Astrue, 496 F.3d 833, 842 (7th Cir. 2007) (finding the ALJ's decision not to give controlling weight to treating physician's opinions was reasonable

where the physician's treatment notes were inconsistent with his conclusion that the claimant could not perform sedentary work); Schaaf v. Astrue, 602 F.3d 869, 875 (7th Cir. 2010) (rejecting the claimant's argument that the because the ALJ did not point to contradictory evidence, the treating physician's finding must be well-supported; the ALJ discounted the treating physician's opinion because the ALJ found the doctor did not explain his opinion and the treatment notes did not clarify the doctor's reasoning).

Dr. Paul's opinions were inconsistent with his own treatment notes. With only two exceptions when Dr. Paul found some tenderness, Dr. Paul's physical examinations of Crumpler were unremarkable. Compare R. 368 (Dr. Paul's May 4, 2011treatment note indicating Crumpler had tenderness over the lumbosacral area) and R. 374 (Dr. Paul's July 23, 2010 treatment note noting tenderness in the sacroiliac joints) with R. 369 (Dr. Paul's March 31, 2011 treatment note indicating no joint deformities, focal weakness, or gross sensory deficit) and R. 375 (Dr. Paul's June 25, 2011 treatment note indicating no joint deformities, focal weakness, or gross sensory deficit). Nothing in Dr. Paul's treatment notes

supports the extent of limitations he identified in his submissions to Lincoln National, and Dr. Paul did not explain his findings.

Dr. Paul's opinions were also inconsistent with the other objective evidence in the record. Dr. Mulshine diagnosed Crumpler with neurogenic type pain in her left foot but did not see any mechanical or structural abnormality in the foot. R. 352 (Dr. Mulshine report). In addition, Dr. VanFleet's treatment notes did not support the extent of limitations identified by Dr. Paul in his submissions to Lincoln National. See, e.g., R. 336 (Dr. VanFleet January 2010 treatment finding Crumpler had good range of motion); R. 337 (Dr. VanFleet December 4, 2009 treatment note wherein Crumpler reported mild improvement and a "little bit of discomfort" in her back, and Dr. VanFleet noted Crumpler could "move across the floor reasonably well").

The Court notes, however, the ALJ made one error. The ALJ stated that Dr. Paul marked on Exhibit 18F (R. 356-57) that Crumpler had sensory deficit, contrary to his treatment notes. R. 23. However, Dr. Paul marked that Crumpler did not have sensory deficient on Exhibit 18F. The Court, nonetheless, finds sufficient support for the ALJ's decision not to afford Dr. Paul's opinion

controlling weight despite that error.  See, e.g., Spencer v. Astrue, 776 F. Supp. 2d 640, 649 (N.D. Ill. 2011) (finding that credibility determination was not undermined by flaws in the ALJ's reasoning so long as there was some support in the record for the ALJ's determination).

Crumpler cites Parker v. Astrue, 597 F. 3d 920, 921 (7th Cir. 2010), in support of her argument that the ALJ erred in not giving Dr. Paul's opinion controlling weight because no examining doctor rendered an opinion contrary to Dr. Paul and the only contrary opinion was that of the state agency consultant who never examined Crumpler and whose opinion predated a significant portion of the record before the ALJ.   Crumpler also argues that the ALJ did not "see fit to mention" the report by the nonexamining physician.

In Parker, all of the professionals who examined the claimant were unanimous that the claimant had "severe, nearly constant, debilitating physical pain, and two of them advised that she can barely walk." Parker, 597 F. 3d at .  The ALJ nonetheless found that the claimant could stand and sit for six hours during a workday.  Id.  The ALJ noted no objective evidence supported the

claimant's allegations of extreme pain and that the doctors'
statements about the claimant's pain was based solely on the
claimant's subjective complaints.  Id. at 922.

The Seventh Circuit reversed, finding that the only thing that
cast doubt on the claimant's complaints were reports by two
nonexamining physicians that the administrative law judge did not
even mention.  Parker, 597 F. 3d at 92 (also noting that the
Chenery doctrine prevented the agency's lawyers from defending the
agency's decision on grounds the agency did not embrace).  The
Seventh Circuit also noted that pain does not always have a
verifiable source:

> It would be a mistake to say "there is no objective
> medical confirmation of the claimant's pain; therefore the
> claimant is not in pain."  But it would be entirely sensible
> to say "there is no objective medical confirmation, and
> this reduces my estimate of the probability that the claim
> is true."  The administrative law judge said the first, not
> the second.

Parker, 597 F. 3d at 923.

Parker is distinguishable from this case.  Unlike Parker, all of
the doctors did not find Crumpler had the severe limitations noted
by Dr. Paul.  Moreover, unlike Parker, the ALJ in this case did
mention the state agency physical evaluation that assessed

Crumpler with the ability to perform a limited range of light exertional work.  R. 27 (ALJ decision), citing Ex. 11F, 14F (R. 327-334, 347-349).

In sum, the Court finds the ALJ adequately explained her decision not to give controlling weight to Dr. Paul's opinions and her decision is supported by substantial evidence.

2.    The ALJ Applied the Relevant Factors When Determining the Weight to Give Dr. Paul's Opinion

Crumpler also argues that the ALJ erred when she considered only whether Dr. Paul's opinion should be afforded controlling weight under the regulations without applying the other relevant factors.

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ considers a number of factors to determine how much weight to give the opinion.  Henke v. Astrue, 498 Fed. App'x 636, 640 n. 3 (7th Cir. 2012) (unpublished disposition); 20 C.F.R. § 404.1527(d) (2011).  Those factors include the length of the relationship and frequency of examination; the nature and extent of the treatment relationship; support from medical signs and laboratory findings, consistency with the record

as a whole; and the degree of specialization by the treating physician.  20 C.F.R. § 404.1527(d).

In this case, the record demonstrates the ALJ considered the relevant factors even if she did not explicitly mention each one.  <u>See</u> <u>Schreiber v. Colvin</u>, 519 Fed. App'x 951, 959 (7th Cir. 2013) (unpublished disposition) (noting that it was clear that the ALJ was aware of and considered many of the § 404.1527(c)(2) factors even if the ALJ did not explicitly weigh each factor); <u>Henke</u>, 498 Fed. App'x at 640 n. 3 (finding it sufficient that the ALJ noted two of the relevant factors).  The ALJ noted the length and nature of Dr. Paul's treating relationship with Crumpler.  R. 23.  While Dr. Paul had treated Crumpler as a child, he had not treated her for many years and only recently began treating her again in September 2009.  One of the forms completed by Dr. Paul for Lincoln Financial was completed shortly after he began treating Crumpler as an adult. <u>See</u> R. 365 (Exhibit 21F).

The ALJ also examined whether Dr. Paul's opinions had support from medical signs and laboratory findings and whether the opinions were consistent with the record as a whole.  R. 28 (finding the opinions inconsistent with Dr. Paul's own treatment

notes and the objective record).  The ALJ noted that Dr. Paul's

opinions were inconsistent with other medical evidence in the

record. R. 28 (citing evidence).

Crumpler argues that the ALJ failed to acknowledge that Dr.

Paul's opinions were internally consistent with one another.

However, his opinions were not internally consistent.

On the September 2009 form, Dr. Paul noted that Crumpler

could not stand, walk, sit, or drive for any hours in an 8-hour work

day.  Exhibit 21F, R. 365.  On the May 2010 Form, Dr. Paul did not

mark that Crumpler had any physical impairments but listed Class

4 mental impairments (unable to engage in stress situations).  He

also marked that Crumpler had no limitation on functional capacity

(marking "Class 1 (No Limitation)").  Exhibit 21F, R. 363.  On the

August 2010 form, Dr. Paul marked that Crumpler had no change

in condition but marked that Crumpler's physical impairments were

severe and that Crumpler was incapable of sedentary activity.

Exhibit 17F, R. 354 (marking physical impairments as "Class 4"

and functional capacity as "Class 4 (Complete limitation)").  Dr.

Paul also marked that Crumpler only had slight limitations with

regard to her mental impairments.  Id. (marking "Class 2").  Clearly, these documents are internally inconsistent.

Finally, Crumpler argues the ALJ erred by finding that Dr. Paul was not a specialist. R. 28.  Crumpler argues this finding was in error because Dr. Paul is a specialist in internal medicine and immunology.

However, Dr. Paul did not give an opinion on an issue of internal medicine or immunology, his area of specialty.  See 20 C.F.R. § 404.1527 ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist"). In fact, Dr.  Paul referred Crumpler to Dr. VanFleet, an orthopedist, for her back problems.  Therefore, the ALJ correctly found that Dr. Paul was not a specialist in the area on which he was offering an opinion.

The ALJ applied the relevant factors when determining the weight to give Dr. Paul's opinions.

## B.  The ALJ's Credibility Determination is Not Patently Wrong

Crumpler next challenges the ALJ's credibility finding. Crumpler argues that the ALJ's explanation for discrediting

Crumpler's testimony was meaningless boilerplate. Crumpler also asserts that the ALJ failed to consider all of the relevant factors. Crumpler states that the one factor the ALJ did consider—Crumpler's daily activities—were misrepresented and the ALJ improperly imputed to Crumpler the ability to perform sporadic daily activities as showing that she could work on a regular and continuous basis.

This Court will not reverse the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record. Simila v. Astrue, 573 F.3d 503, 517 (7th Cir. 2009). Moreover, an ALJ's credibility determinations are entitled to "special deference." Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013).

"SSR 96-7p provides a two-step test for adjudicators to follow when evaluating a claimant's symptoms such as pain." Maske v. Astrue, 2012 WL 1988442, at *11 (N.D. Ill. 2010), citing SSR 96-7p, Titles II and XVI: Evaluation of Symptoms in Disability Claims; Assessing the Credibility of an Individual's Statements, 61 Fed. Reg. 34483, 34484-85 (July 2, 1996). First, "the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s) . . . that could reasonably be

expected to produce the individual's pain or other symptoms." SSR 96-7p., 61 Fed. Reg. at 34484. Second, if there is such an impairment, "the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Id. at 34485; see also 20 C.F.R. § 404.1529 (detailing how a claimant's symptoms will be evaluated).

If the claimant's statements about her symptoms are not substantiated by objective medical evidence, the "adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." 61Fed. Reg. at 34484; see also Doering v. Astrue, 2012 WL 1418851, *3 (N.D. Ill. 2012) ("An ALJ may not discredit a claimant's subjective complaints of pain and limitations solely because of a lack of corroborating medical evidence"). The ALJ must consider the individual's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; medication taken to alleviate the pain or symptoms; treatment received for relief of the pain or other symptoms; and other measures the individual uses to relieve the

pain or symptoms. Id. at 34485; see also Sienkiewicz v. Barnhart, 409 F.3d 798, 804 (7th Cir. 2005) (noting that while an "ALJ may not disregard an applicant's subjective complaints of pain simply because they are not fully supported by objective medical evidence . . . a discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration").

As noted above, the ALJ found that while Crumpler's "medically determinable impairments could reasonably be expected to cause some symptoms," Crumpler's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 24. Although the Seventh Circuit has criticized the use of such "boilerplate language," the inclusion of that language is harmless if the ALJ otherwise adequately explains her conclusion. Filus v. Astrue, 694 F. 3d 863, 868 (7th Cir. 2012).

In this case, the ALJ explained her conclusion. The ALJ noted that Crumpler testified she could only sit for five minutes but was able to take a car trip from Illinois to North Carolina two weeks

prior to the hearing, took a car trip from Florida to Illinois in July of 2009 (Ex. 5F, p.3; r. 282) and sat at the hearing for longer than five minutes.  R. 24.

The ALJ also detailed the medical evidence, which she found did not demonstrate medical findings to support the degree of symptoms identified by Crumpler.  R. 24.  The ALJ noted that although Crumpler testified she has poor grip, she is able to smoke 10 to 20 cigarettes a day and manipulate the cigarette package and her cigarettes.  She is also able to use a home computer.  Further, she exhibited no weakness in her hands at the April 16, 2010 examination with Dr. VanFleet.  R. 25, citing R. 350 (Dr. VanFleet treatment note).

After detailing the medical records, the ALJ concluded that Crumpler's physical impairments did limit Crumpler's overall level of functioning but that the evidence did not establish that the impairments are disabling.  R. 28.  The ALJ stated that the medical evidence, laboratory findings, and Crumpler's reported activities indicate her functioning is not as limiting as she alleges, and the ALJ did not find the testimony of the claimant – that she was

unable to sustain any full-time work activities – supported by the record.  R. 28.

The ALJ noted that Crumpler lived independently with a small dog, drives a truck, shops for groceries, fixes light meals, makes coffee, walks around, goes on-line to send emails, sits on the porch, and otherwise sits, stands, walks throughout any eight hour period. R. 28.  Crumpler also traveled to North Carolina two weeks prior to the hearing to see her boyfriend and recently went to Lincoln, Illinois, to drive through a state park.  Crumpler testified that she has help with housework, likes to nap, and takes longer to take care of her personal hygiene.  R. 28.  The ALJ found that Crumpler engages in daily activities that demonstrate the ability to sit, stand, walk, lift light items, and otherwise perform work-like activity and has not demonstrated with credible evidence that she is unable to sustain such activity in a full-time job.  R. 28.

The ALJ properly relied on the objective medical evidence and other evidence that contradicted the credibility of Crumpler's claims.  Arnold v. Barnhart, 473 F. 3d 816, 823 (7th Cir. 2007) (wherein the ALJ relied on the neutral medical expert's testimony and the fact that the claimant's daily activities showed he only had

mild restrictions, among other factors); <u>Mueller v. Astrue</u>, 860 F. Supp. 2d 615, 633 (N.D. Ill. 2012) (noting that the claimant's "subjective complains were not required to be accepted insofar as they clashed with other, objective medical evidence in the record").

Crumpler also argues the ALJ misrepresented her daily activities but does not identify the misrepresentations. Therefore, she has forfeited this argument.

Because the ALJ provided specific reasons for her credibility finding, and those reasons are supported by the record, the ALJ's credibility determination will not be overturned.

## IV. CONCLUSION

For the reasons stated, Crumpler's Motion for Summary Judgment (d/e 14) is DENIED, and the Motion for Summary Affirmance filed by Defendant Commissioner of Social Security (d/e 16) is GRANTED. The decision of the Commissioner is AFFIRMED. This case is closed.

ENTER: June 16, 2014

FOR THE COURT:

<u>       s/Sue E. Myerscough</u>
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE